UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SARAH M. POLLOCK, ) CASE NO. 08-61101-CIV-WPD
Plaintiff,
-v-
BAY AREA CREDIT SERVICE, INC.,
Defendant.

Fort Lauderdale, Florida
August 17, 2009
9:00 a.m.

EXCERPT - TESTIMONY OF SARAH M. POLLOCK

TRANSCRIPT OF TRIAL PROCEEDINGS

BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

U.S. DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: DONALD A. YARBROUGH, ESQ.
Suite 105
2000 East Oakland Park Boulevard
Fort Lauderdale, Florida 33394
-and-
LEO BUENO, ESQ.
3001 Ponce de Leon Boulevard
Suite 262
Coral Gables, Florida 33134

For the Defendant: ERNEST "SKIP" KOHLMYER, III, ESQ.
2707 East Jefferson Street
Orlando, Florida 32803

Reporter: ROBERT A. RYCKOFF
Official Court Reporter
299 East Broward Boulevard
Fort Lauderdale, Florida 33301
954-769-5657

(Call to order of the Court.)

* * * * * *

THE COURT: Mr. Yarbrough, you may call your first witness.

MR. YARBROUGH: Yes, sir.

I call Sarah Pollock.

SARAH M. POLLOCK, PLAINTIFF, SWORN.

THE COURT: Please state your full name and spell your last name for the record.

THE WITNESS: Sarah Michelle Pollock, P-o-l-l-o-c-k.

DIRECT EXAMINATION

BY MR. YARBROUGH:

Q. Ms. Pollock, did you ever give your cell phone number to American Medical Response?

A. No, I did not.

Q. Did American Medical Response ever ask you for your cell number?

A. No, they did not.

MR. KOHLMYER: Objection, Your Honor. Leading.

THE COURT: Overruled.

Q. Let me repeat that. I think there was an interruption as to your answer.

Did American Medical Response ever ask you for your cell number?

A. No, they did not.

Q. Can you go back to the day that you were hospitalized and tell the jury what happened that day?

A. At the first hospital?

Q. Yes.

Go back to the -- did you have lunch on that day, the day you were hospitalized?

A. Yes.

The day this happened I went out to lunch and went to a place near my boyfriend's house and went to have lunch. I was there and -- by myself -- and I was with -- by myself in the beginning. And I went down and had lunch. I had a glass of wine. And then I wanted to step outside to have a cigarette because you could not smoke in the restaurant. Some people were talking to me in the restaurant. So I sat outside with them while I finished my second glass of wine.

At this time I went out and I went to the restroom --

(Pause.)

A. Like I said, I went to the restroom. I came back. I started feeling very strange and funny at this point and I was a little out of it. And the people that I was talking to -- I was feeling a little strange about the situation, so I decided to leave.

Q. Excuse me, Ms. Pollock.

Let me get this straight. You were in the restaurant having your lunch. And then you went out to have a cigarette

and you met some people that were outside the restaurant?
A. Yes.
They were inside and then they went outside as well because they were smoking.
Q. How many people were there?
A. There were three.
Q. Okay.
And were they men or women?
A. There was one female and two males.
Q. Okay. All right.
I am sorry. You can go ahead.
A. Like I said, I started feeling a little bit weird, so I ended up leaving.
From leaving -- I have no recollection of driving home.
I went to my boyfriend's house. He said I was acting very strange. I was telling him that I had lunch, I had a sandwich and soup and two glasses of wine.
And I said that I think that these people I was sitting with may have put something in my drink because I was feeling very, very strange.
Then, again, from that point he apparently -- my boyfriend -- called my sister and asked my sister to come and meet me at my apartment, which is in Davie.
And he drove me down to my apartment and was telling

my sister what had been happening. And they weren't sure. I was very upset. I was crying. I didn't know what happened. I was trying to explain to them.

And I also suffer from anxiety and panic attacks, so I had taken a prescription medicine I have from my doctor.

Q. What is that called?

A. It's for Xanax.

Q. At what point did you take that?

A. This was at my apartment when my boyfriend and my sister were there and also her husband.

Q. Okay.

Thank you.

A. And I took the pill.

And they didn't see me take it. They didn't know if I had taken too much or something.

And a lot of this part is a little bit hazy, but my sister called 911 because of my behavior. She didn't know what was happening. She didn't know because I had told her that I was concerned at this restaurant that someone might have put something in my drink. So she called 911.

So the -- to the best of my knowledge the police showed up there and also an ambulance. And this is not the ambulance in question. This is the first ambulance. And I was transported to Westside Hospital. And I had to go there. I had to -- from what I remember I was in the emergency room.

They had to give me something to get whatever they thought was in my system out of me. I was in there overnight. I spent one night there. I was told by the hospital personnel that I had to be transported because of the nature of the situation and that I took my anxiety medicine. And my sister did not know how much I took.

I was Baker Acted, which I don't know the legal definition, but I guess they were worried I was trying to harm myself.

So because of this nature of this situation I had to be transferred to another hospital to go get an evaluation to make sure that I was okay.

So from Westside Hospital, I was there. My sister had spent the night with me in the hospital. She was there. And then at that time they told me the ambulance was going to come. I had to be transported by a second ambulance to Florida Medical Center. And I waited. They said they were going to be there sometime in the late afternoon to pick me up. They never showed up. Nobody explained to me what was happening. They just said they are going to be here, they are going to be here. They didn't end up showing up until I think it was around midnight or something.

At that point this is when American Medical Response Ambulance came to pick me up. They picked me up. They transported me then to Florida Medical Center where I then had

to be checked in and stay two more days until I was released.

Q. When American Medical came and got you at the first hospital and took you to the other hospital, did they ask you any questions?

A. They asked me how I was doing.

I told them that I was doing fine. I said but I was very upset that it had taken so long for them come get me. I was upset over the situation and wanted to get this done and move to the next hospital.

Q. Did it ever come to your attention why it took the ambulance company so long to get there?

A. No.

The only reason I noticed is because in the file that we have through this case that they were verifying my benefits, because at the time I had an HMO, I believe it was, and it was one company. But for this type of thing, for any mental healthcare benefits you had to get a secondary thing. So the paperwork that they have shows that they were verifying benefits and that's what took them so long to get me.

Q. Okay.

And when you went to the second hospital, how long were you there until you saw a doctor?

A. It was about two days.

Q. Two days before you even saw the first doctor?

A. Yes.

Q. Okay.

And then when you saw that doctor what happened?

A. The doctor just asked me about what had happened a few days prior to that, asked me how I was feeling, you know, if I had any tendencies to hurt myself, which I don't. I love my life. And I think I only talked to that doctor for probably five minutes.

Q. And then what happened?

A. They said: You are fine. And released me.

Q. The doctor said you could go home?

A. Yes.

Q. So this whole ordeal took, what, two or three days?

A. I think it was about two days.

Q. But after you saw the doctor at the second hospital that you were there for a day or two?

A. I was released right after I saw the doctor.

Q. Okay.

And they didn't think anything was wrong you?

A. No, they did not.

Q. What do you think happened?

A. I think that something must have been put in my drink and mixed with the alcohol because there was no -- there was no explanation for what had happened. I had two glasses of wine. I wasn't tipsy or drink or anything like that. I have had wine before.

Q. How did you get to the restaurant?
A. I drove myself.
Q. How did you get home from the restaurant?
A. I am assuming I drove myself, but I don't remember.
Q. You don't have a recollection of driving home from the restaurant?
A. No.
Q. Okay.
A. The last thing I remember at the restaurant was feeling strange and knowing that I needed to leave.
Q. At the time this happened were you employed?
A. Yes, I was.
Q. And what did you do?
A. I worked at Banyan Air Service (phonetic) at Executive Airport in Fort Lauderdale. I was a customer service representative.
Q. That's an airplane company or something?
A. It's an FBO (phonetic). It's for people that have their own private planes are based.
Q. Okay.
Did you have any sort of drug testing at your job?
A. Yes, we did.
Q. And did you ever test positive for drugs?
A. No, I did not.
Q. So do you write this whole thing off -- I mean what kind

of -- do you consider this just a bad luck sort of experience, an unpleasant thing that happened?

MR. KOHLMYER: Objection. Leading, Your Honor.

THE COURT: Sustained.

A. It was quite unpleasant. It was one of the most traumatic and scary experiences I think I have ever gone through.

MR. KOHLMYER: Your Honor, I move to strike the answer. There was no subsequent question after the objection --

THE COURT: Ignore the last answer.

Q. When this happened you did have insurance, right?

A. Yes, I did.

Q. The first ambulance that came and picked you up from your house, did that ambulance company -- did they get paid?

A. Yes, they did.

Q. Did the hospital -- the first hospital that you went to, did they get paid?

A. Yes.

Q. Did the second hospital you went to get paid?

A. Yes, they did.

Q. Is it your understanding -- what's your understanding of the number of times Bay Area Credit called your cell phone?

A. I am sorry. I don't --

Q. What is your understanding of the number of times that Bay Area Credit called your cell phone?

A. It was obsessive. I mean it was too much. The calls were non-stop. I was getting -- they would start in the morning. They would end at night. And it was call after call. They would change their number on occasion.

Q. What do you mean they would change their number?

A. It would come up and it would be a different number.

Q. On what?

A. Someone else.

Q. On what?

A. On my cell phone.

Q. You mean your Caller ID?

A. Yes.

Q. Okay.

Would it come up on the Caller ID and say the number was blocked?

A. Most of the time it came up as a number. Sometimes it said "Unavailable." But the number seemed to continually change. It would be the same area code. But the number like the list four digits would change.

Q. Okay.

A. But I would not answer those calls.

Q. Did you ever get any -- strike that?

MR. YARBROUGH: No further questions.

THE COURT: Cross examination.

MR. KOHLMYER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. KOHLMYER:

Q. Good morning, Ms. Pollock.

A. Good morning.

Q. The telephone number that you have on your cell phone, is that 954-558-4930?

A. Yes, that is my cell phone.

Q. And that's your primary source of contact, is it not?

A. I also have a land line.

Q. Isn't it a fact that you use your cell number as your primary contact?

A. I use it as a primary contact for my friends and family.

Q. Okay.

Anybody else?

A. Not particularly.

When I had my job they had my cell phone number, but it was pretty much people that needed the number.

Q. Okay.

At the time of the transport from Westside Regional to Florida Medical was your address 3771 West State Road 84 in Davie?

A. Yes, it was.

Q. And your date of birth is in August?

A. Yes, it is.

Q. 1974?

A. Yes.

Q. Okay.

And you were employed at the time?

A. Yes, I was.

Q. Okay.

Did you ever tell anybody at the hospital that you were employed?

A. Well, the first hospital I was unable to communicate with anybody because of my condition.

Q. Let me clarify.

After -- right before transport from Westside Regional Hospital, at any time during that did you ever inform anybody that you were employed?

A. I didn't have any communication with anybody as far as my name, address, insurance. No communication with anybody whatsoever.

Q. Were you presented documents in which to sign authorization forms from the transport company, American Medical Response?

A. I was presented documents when I was released from Florida Medical Center that I just had to sign for my release.

Q. No, ma'am. That's not my question.

My question is: Did you sign an authorization form from American Medical Response?

A. Yes.

I have seen the one that I have signed, yes.

Q. Okay.

And was that -- did you look over that document before you signed it?

A. No.

I signed that when I checked out from Florida Medical Center.

Q. So you looked it over and read over the information and then signed it?

A. I looked over all the documents briefly, yes. I was ready to leave the hospital and I signed it.

Q. You had mentioned that you had waited around for the attending ambulance to have you transported, is that correct?

A. Yes.

I was told they were going to pick me up in the afternoon and they didn't show up until several hours later.

Q. Were you waiting in your room?

A. Yes, I was.

Q. At that time were you able to get out of bed?

A. No.

I wasn't allowed to leave the room. I had a person because of why I was at the hospital that was in the room with me.

Q. Were you awake?

A. Yes, I was awake.

Q. Were you able to talk to other people?
A. I could, but nobody was in there except the person that was watching me.
Q. Okay.
Did you talk to the EMT's when they came in to transport you?
A. Yes.
That's when they asked me how I was feeling.
Q. Were you feeling better than you were the day before?
A. Yes.
I was awake and very aware of what was going on.
Q. Okay.
And you didn't provide any information to any of the hospital staff at any time?
A. No, I did not.
Q. Was anybody with you?
A. At the first hospital my sister was there, yes.
Q. Okay.
At the time of transport from Westside Regional Hospital was anybody with you during that transport?
A. No.
Q. You were by yourself?
A. Yes, I was.
MR. KOHLMYER: That's all I have, Your Honor.
THE COURT: Redirect?

MR. YARBROUGH: Yes, sir.

REDIRECT EXAMINATION

BY MR. YARBROUGH:

Q. You know, Mr. Kohlmyer asked you if you gave any information to the hospital. That's a separate question from whether -- and I believe your answer to that was no, you hadn't given any information to the hospital, is that right?

MR. KOHLMYER: Objection. Leading, Your Honor.

THE COURT: Sustained.

Q. Do you know -- let me ask you this: When you went to the hospital and you were later released from the hospital -- when you were later released from the hospital, was your cell phone provided to you by the hospital that time?

Did they give back your sell, so to speak?

MR. KOHLMYER: Objection. Leading, Your Honor.

THE COURT: Sustained.

Q. When you left the hospital, the second hospital, did you see your cellular phone?

MR. KOHLMYER: Objection. Leading, Your Honor.

THE COURT: Overruled.

Q. You can answer that question.

A. Yes.

All of my belongings were inside of my purse.

Q. Okay.

And did that include your cell phone?

A. Yes, it did.

Q. Okay.

And could the -- the first hospital that you went to -- right -- could they have looked at your cell phone and gotten your cell number off of that phone?

MR. KOHLMYER: Objection, Your Honor. Lack of predicate. It calls for speculation.

THE COURT: Overruled.

Q. You can answer that.

A. Yes, they could have.

Q. Okay.

Weren't the police involved? Didn't the police come to your house?

A. Yes, they were.

Q. Could the police have gotten your cell number from your cell phone?

MR. KOHLMYER: Objection, Your Honor.

THE COURT: Overruled.

A. Yes, they could have as well.

Q. What about your insurance company, did your insurance company have your cell phone number?

A. Yes, the insurance company had my cell phone number.

Q. And you know that American Medical, the ambulance company, was in touch with your insurance company, isn't that right?

A. Yes, because they were trying to verify my benefits for

the second transport.
Q. So couldn't American Medical have gotten your cell phone number from your insurance company?
MR. KOHLMYER: Objection, Your Honor. Lack of predicate. It calls for speculation.
THE COURT: Sustained.
Q. You know that your insurance company had your cell phone number, is that right?
A. Yes.
MR. KOHLMYER: Objection. Leading.
THE COURT: Sustained.
Q. You know that -- you believe -- you know that American Medical was in touch with your insurance company, is that right?
MR. KOHLMYER: Objection. Leading, Your Honor.
THE COURT: It's asked and answered.
Q. Were there other people at your house that could have given your cell phone number to the police or the first ambulance company or the hospital?
MR. KOHLMYER: Objection, Your Honor. It's the same objection. Just different ways.
THE COURT: Overruled.
Q. You can answer that.
A. Yes.
There were my boyfriend was there, my sister was

there and her husband.

Q. Did your sister live with you?

A. No, she did not.

Q. Did she have your cell number?

A. Yes, she did.

Q. Did your boyfriend have your cell number?

A. Yes, he did.

Q. The document that Mr. Kohlmyer mentioned that he said that you signed, did that document have your cell phone number on it?

A. No, it did not.

Q. Was that document a credit application?

A. No, it was not.

Q. Did American Medical ever -- at the time this happened when you were hospitalized and all -- did American Medical ever show you any papers that had your cell phone number on it?

MR. KOHLMYER: Objection. Leading.

THE COURT: Overruled.

A. No.

I never saw any of the forms until during this case.

Q. I am sorry. That's not my question.

A. I am sorry.

Q. At the time that this happened did American medical ever show you any papers that had your cell phone number on it?

A. No, they did not.

MR. YARBROUGH: No further questions.

THE COURT: Anything further, Mr. Kohlmyer?

MR. KOHLMYER: Yes.

Just briefly, Your Honor.

THE COURT: Okay.

RECROSS EXAMINATION

BY MR. KOHLMYER:

Q. Ms. Pollock, you have no idea how American Medical received your biographical information, do you?

A. No, I do not.

Q. You don't have any evidence that they received their information from either the hospital or the police, your boyfriend or your sister, do you not?

A. It could have been from any one of them.

Q. And it could have been from you?

A. No, it wasn't from me.

MR. KOHLMYER: Thank you, Your Honor.

THE COURT: Anything further?

MR. YARBROUGH: No, not with this witness.

THE COURT: Thank you, ma'am. You may step down.

THE WITNESS: Thank you.

(Witness complies.)

* * * * * *

MR. KOHLMYER: Your Honor, I would briefly like to recall Ms. Pollock.

THE COURT: Okay.

THE COURT: Ms. Pollock, you understand you are still under oath?

THE WITNESS: Yes, I do.

SARAH POLLOCK, DEFENDANT'S WITNESS, PREVIOUSLY SWORN.

DIRECT EXAMINATION

BY MR. KOHLMYER:

Q. Ms. Pollock, we have just tone over in a document that the defendant has admitted into evidence and I want to show it to you.

MR. KOHLMYER: May I approach the witness, Your Honor?

THE COURT: Okay.

Q. I have handed you what we have marked as Defendant's Exhibit 1, for identification, and I have flipped to the third page, which is entitled Master Signature Statement Patient Authorization and Payment Agreement.

Do you see that document?

A. Yes, I do.

Q. Is that your signature?

A. That is my signature, but that is not my handwriting to the left of that.

Q. Okay.

But that's your signature on that document?

A. Yes, it is.

MR. KOHLMYER: That's all I have, Your Honor.

THE COURT: Cross examination.

CROSS EXAMINATION

BY MR. YARBROUGH:

Q. Ms. Pollock, even though that's your signature on that page, you didn't provide any of this information at all to American Medical?

MR. KOHLMYER: Your Honor, outside the scope of direct.

THE COURT: I am going to allow it.

Q. Isn't that correct?

A. On all these other forms, no. This information was not provided by me.

And specifically I can say the sheet that they are saying that is filled out by the EMT given by me, that is totally incorrect. All of this health information that is on this second sheet, all of this information is my healthcare plan, their address, my policy number. None of this information I know or I don't think anybody knows off the top of their head, this information was all contained in my purse and my clothing that I had at the first hospital that was already bagged up at the hospital waiting for my transport, which was supposed to be at 4:00 o'clock. There is no way any of this information -- I did not give them any of this information.

It also says on here I was unemployed. I wouldn't have told them I was unemployed. I was working at the time.

Q. Is your name spelled correctly on that document?

A. On the second sheet, no, it is not.

Q. Okay.

At the time that document was filled out, did you have a Florida driver's license?

A. Yes, I did.

Q. Is it listed on there?

(Pause.)

A. No -- on the second sheet?

Q. Yes.

A. No, I don't see the driver's license on there, no.

Q. When you signed -- the one piece of paper that you signed, when was that?

A. This information was all I said before in my testimony. All the sheets I signed were when I was released from Florida Medical Center.

Q. When you say all the sheets you signed, what you mean -- I mean, tell me what you mean.

You didn't see all of those sheets together, did you?

A. No.

I have never seen all of these documents until before my deposition was in May, a few days before that.

Q. Okay.

So when you signed that document was when you were leaving the second hospital, is that right?

A. Yes.

MR. KOHLMYER: Objection. Leading.

THE COURT: Sustained.

Q. At the time -- when did you sign that document?

A. I don't remember the date I was released from the hospital. And there is no date even listed on here for my signature.

Q. The signature page isn't even dated?

A. No.

There is no where on there for me to even enter a date.

Q. But it's your memory -- your recollection you signed the papers when you left the second hospital?

A. Yes.

Q. Okay.

And when you signed that paper were there any other sheets with it from American Medical, these other sheets that are in front of you now?

A. No.

None of these other sheets I have never seen before until my deposition.

The only other sheets I have for my release were from Florida Medical Center.

Q. Now, it says in there that you are unemployed.

How would they have gotten information from you saying that you were unemployed?

MR. KOHLMYER: Objection, Your Honor. Lack of predicate. Speculation.

THE COURT: It calls for speculation. I sustain the objection.

MR. YARBROUGH: Yes, sir.

Q. I believe I may have asked you this, but just in case I didn't: When you were in the hospital -- the first hospital -- and you were transferred to the second hospital, didn't they take away your purse and cell phone?

A. Yes.

Q. You didn't have those?

A. No.

Q. You could not have given your insurance card information to the ambulance driver?

A. No.

I didn't have access to any of that information.

Q. And you were going to a hospital for psych care, is that right?

A. Yes.

Q. And they knew it, right?

A. Right.

Q. The ambulance drivers knew it?

A. Yes.

And it's stated clearly on these forms that I was going there for that.

Q. It's your testimony that you never gave your cell number to American Medical at any time?

A. No, I did not give them.

MR. YARBROUGH: Thank you.

THE COURT: Redirect?

MR. KOHLMYER: Yes. Redirect.

REDIRECT EXAMINATION

BY MR. KOHLMYER:

Q. Ms. Pollock, in looking at the document that's attached on the second page, is that your direct address?

A. That was at the time, yes.

Q. Is that your correct Social Security number?

A. Yes, it is.

Q. Is that your correct telephone number?

A. That was my cell phone number, yes.

Q. Is that your correct date of birth?

A. Yes, it is.

Q. The information below as far as AVMED Health, is that correct? Is that accurate -- information correct?

A. I don't know. I would have to look it up.

I don't have that insurance any more.

Q. Up in the corner when it talks about "Run Date," was that

the date in which you were transported from Westside Regional Hospital to Florida Medical Center?

A. I don't see where it says "Run Date."

Q. Do you see where it says "Business Unit" up in the right-hand corner?

A. And it's stating "7/17"?

Q. Yes.

A. No, because they actually didn't come until after midnight, so that wouldn't have been the correct date, no.

Q. Okay.

But it would have been during the evening and/or the morning of the 18th?

A. Yes.

Q. Okay.

Were you transported from Westside Regional Hospital to Florida Medical Center?

A. Yes, I was.

Q. And that was for psychiatric care?

A. Yes.

Q. And you previously testified that you were fully cognizant, correct?

A. Yes, I was.

Q. Fully aware of what was going on?

A. Yes.

Q. In fact, you were a little upset that they were a little

late in coming pick you up?

A. They were very late, yes.

Q. Okay.

You recognize your signature on the authorization?

A. Yes.

Q. And before you signed this agreement you looked at all the paperwork before you signed what you were reading?

A. Yes.

This is an agreement saying that I will pay the bill.

It's not saying I gave them my cell phone number, no.

Q. But it was attached to everything else that you had signed?

A. No.

This was not attached. This was with the paperwork from Florida Medical. These other three sheets were not attached to anything.

Q. When you received it?

A. Yes. When I received it.

Q. Okay.

So in this one instance when they were dealing with you, all of these documents were not put together as we have just heard --

A. No.

I have never seen these other forms until before my

deposition.

Q. And you believe that you signed these after you exited the second hospital?

A. I signed the one, yes. I did not sign any paperwork as to the first hospital. ' All of my paperwork I am assuming was filled out and given to the hospital by my sister or they went through my purse.

Q. So it's your testimony that on the evening or the morning when you were being transported you didn't sign this document?

A. No, I did not.

MR. KOHLMYER: That's all I have, Your Honor.

THE COURT: Anything further, Mr. Yarbrough?

MR. YARBROUGH: No sir.

THE COURT: Thank you, ma'am. You step down.

THE WITNESS: Thank you.

(Witness complies.)

* * * * * *

REPORTER'S CERTIFICATION

I hereby certify that the foregoing is a true and accurate transcript of the proceedings recorded by me and reduced to typewriting at my direction.

Court Reporter
Robert Ryckoff
/S/ Robert Ryckoff

Date: 1/19/10

SARAH M. POLLOCK, PLAINTIFF, SWORN....................... 2 7
DIRECT EXAMINATION
BY MR. YARBROUGH: ............................ 2 11
CROSS EXAMINATION
BY MR. KOHLMYER: ......................... 12 1
REDIRECT EXAMINATION
BY MR. YARBROUGH: ............................ 16 2
RECROSS EXAMINATION
BY MR. KOHLMYER: ............................... 20 6
SARAH POLLOCK, DEFENDANT'S WITNESS, PREVIOUSLY SWORN.... 21 5
DIRECT EXAMINATION
BY MR. KOHLMYER: .......................... 21 6
CROSS EXAMINATION
BY MR. YARBROUGH: .............................. 22 3
REDIRECT EXAMINATION
BY MR. KOHLMYER: ............................... 26 10